NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0173-12T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ALFRED J. SMITH, a/k/a
AL J. LEWIS, JEROME SMITH,

    Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

July 29, 2014

APPELLATE DIVISION

Submitted April 8, 2014 - Decided July 29, 2014

Before Judges Sapp-Peterson, Lihotz and Hoffman.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 09-12-1062.

Joseph E. Krakora, Public Defender, attorney for appellant (Jason A. Coe, Assistant Deputy Public Defender, on the briefs).

John J. Hoffman, Acting Attorney General, attorney for respondent (Jeffrey P. Mongiello, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

LIHOTZ, J.A.D.

Defendant Alfred J. Smith appeals from a judgment of conviction for second-degree robbery, N.J.S.A. 2C:15-1 (count one) and third-degree hindering apprehension, N.J.S.A. 2C:29-

3(b)(4) (count two), entered following a jury trial. Prior to trial, defendant challenged the admissibility of the victim's out-of-court identification. His motion to suppress was denied. Following conviction, defendant was sentenced to a ten-year term, subject to the eighty-five percent period of parole ineligibility imposed by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, on the second-degree robbery conviction, and a concurrent five-year term on the third-degree hindering apprehension conviction.

On appeal, defendant argues:

POINT I

THE TRIAL COURT SHOULD NOT HAVE ALLOWED THE SHOW[-]UP IDENTIFICATION TO BE USED AT TRIAL BECAUSE IT DID NOT SATISFY CONSTITUTIONAL STANDARDS OF RELIABILITY.

POINT II

THE PROSECUTOR'S APPEAL TO THE JURY TO CONVICT SMITH IN ORDER TO PROTECT THEMSELVES AND THE COMMUNITY WAS IMPROPER AND HIGHLY PREJUDICIAL. (not raised below)

POINT III

OFFICER MARTINA IMPROPERLY PROVIDED LAY OPINION TESTIMONY ON AN ISSUE WHICH WAS NOT BEYOND THE KEN OF THE AVERAGE JUROR. (not raised below)

Following our review, we conclude the motion judge erred in denying defendant's motion to suppress the identification testimony. Accordingly, we reverse the suppression order,

vacate his conviction and remand for further proceedings, including a new trial.

These facts are taken from the pre-trial Wade[1] hearing. The State presented the testimony of Plainfield Police Officers Edward Jackson and Charles Martina. The defense called the victim, Josephine DiMeglio.

Officer Jackson testified he responded to a call received at approximately 10:30 p.m., on July 10, 2009, from DiMeglio who was assaulted and robbed as she walked toward her home. Specifically, DiMeglio was suddenly attacked from behind by a man trying to snatch her purse. A struggle ensued, during which the assailant slapped DiMeglio, injuring her and causing her to fall to the ground. The scuffle continued briefly as DiMeglio resisted, but ultimately she relaxed her grip and the assailant fled with her purse.

DiMeglio called 9-1-1. Then, approximately ten minutes after the robbery, DiMeglio described her attacker to Officer Jackson as "a tall black male" wearing "jeans and a dark shirt." She also stated the attacker wore a brown windbreaker. Officer Jackson confirmed on cross-examination the description was "[j]ust a tall black male and a clothing description."

---

[1] United States v. Wade, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967).

Officer Jackson radioed the description and within ten minutes, Officer Martina, who was canvassing the area, encountered defendant four blocks away sitting in a park with others. Officer Martina believed defendant matched the radioed description and he informed Officer Jackson, who in turn told DiMeglio "we might have someone fitting the description . . . ." Officer Jackson "asked her if she can take a ride [to] see if she can make a positive ID on the person." Officer Jackson brought DiMeglio to the park. He recalled defendant was standing next to Officer Martina. Without hesitation, DiMeglio identified defendant as her assailant.

After DiMeglio viewed defendant at the show-up, she provided her written statement to police. In that statement, DiMeglio described her attacker as: "Afro-American, 6feet [sic] tall, 5-8, brown shirt, cap and black pants."

Officer Martina also testified. He recalled the description of DiMeglio's assailant radioed from Officer Jackson was "[a] black male, black shirt, brown windbreaker, over six feet tall." As he drove toward the park he aimed his spotlight on "a group of people, [and an] individual matching the description[] immediately looked startled and scared." Defendant was among those in the group. He wore a black hoodie and brown pants; he did not have a windbreaker. Officer Martina

acknowledged the description he received was not the most detailed and did not include the alleged assailant's age, the presence or absence of facial hair, or whether he was bald.

When asked by Officer Martina, defendant gave his name as "Thomas J. Smith." Once Officer Martina was told DiMeglio identified defendant as her attacker, he was arrested and charged with second-degree robbery and third-degree hindering apprehension.

When arrested, defendant possessed a $5 bill, $1.75 in change, a silver chain, four keys, two shoestrings, a driver's license, three cell phone batteries, a cell phone, and a brown cap. DiMeglio's later-provided police statement listed the following as stolen: "a gold canvas bag" containing her wallet, two money orders, $100 cash, and her identification cards. None of these effects were found on defendant's person or recovered.

Defendant called DiMeglio during the hearing. She described the incident, confirming an assailant approached her from behind and grabbed her purse, but she would not let go. She was "shocked" and "started to scream," because she did not want the assailant to take her property. The attacker slapped DiMeglio on her right cheek, bruising her lip and causing her to fall. She was still holding the leash of her bag when the assailant dragged her in an effort to get her to release her

grip. She ultimately let go and he fled with her purse. DiMeglio admitted the events unfolded "very quickly."

DiMeglio noted the attack took place at nighttime, but there was one streetlight across the street. Defense counsel asked her to describe the most prominent details she recalled about her attacker. For the first time, DiMeglio stated her assailant "was smoking a cigar," saying he had a "Black and Mild in his mouth." She explained he had hair, although noting defendant as he sat in the courtroom was bald. The remaining details of the attacker's description included that he "was tall," had a scar on his mouth, "a cap on his head," and wore "something black and something brown[.]"

DiMeglio was also questioned about the show-up. When she was taken to the park, she was told "they had apprehended him and he was across the street in the park, . . . [and they wanted her] to take a look at him and to see if he was the man that mugged [her]." DiMeglio recalled a man standing between two police officers. She immediately recognized his face. When asked "[w]hat was the greatest feature that confirmed to you this was the same man[,]" she stated: "[h]e had the same clothes on when he robbed me and it was him. He had the black jacket [and] brown pants. I recognized his face when he mugged me. It was his features." Pressed to reveal the identifying features

of her attacker, DiMeglio stated: "It was his eyes. . . . They were mean."  When questioned by the State, DiMeglio stated she was one "[h]undred percent sure" defendant was her attacker.

Considering defendant's motion to suppress DiMeglio's out-of-court identification, the motion judge found the police officers' testimony credible in establishing the events. Further, the motion judge found DiMeglio "extremely credible" and "extremely accurate."  Despite the suggestiveness of the procedure, the motion judge determined DiMeglio's identification was reliable because she "had a close physical one-on-one contact with . . . defendant and had ample opportunity to view him"; her account was detailed suggesting she "paid attention to the details of her assailant"; "the show[-]up occurred almost immediately after the incident and defendant was wearing similar clothes and was similar in appearance to [DiMeglio's] original description . . . made about ten minutes earlier"; DiMeglio was able to identify defendant, with certainty, a finding supported by the officers' testimony about the immediacy of her recognition of defendant and her own testimony that she was "one hundred percent" certain defendant was her assailant; and she provided the identification proximate to the attack, "shortly after the incident, approximately ten minutes[,]" and only three

or four blocks from the scene of the crime. Defendant's motion to suppress the identification was denied.

The case was tried over two days by another Law Division judge. Defendant attacked the State's identification evidence. We note DiMeglio's trial testimony varied in many significant respects from her testimony at the Wade hearing. DiMeglio stated her attacker approached her not from behind, but "sideways," from her left side. She stated she saw the assailant's face, first as she walked along the street then the entire time he tugged at her purse until he successfully dislodged her grip and ran off. She identified two working streetlights in the area and recalled her description of the attacker as an "Afro-American male, tall . . . wearing [a] black hoodie and brown pants."

At trial the 9-1-1 tape was played. During her call, DiMeglio told the operator it was dark, but she described the man as wearing a black shirt, a brownish windbreaker and black pants. When asked about the variations of her descriptions of the assailant's clothing from her initial 9-1-1 call to trial, DiMeglio testified she was initially "shaken up" and "didn't really get to match everything, put everything together[.]" DiMeglio did not describe any specific facial or physical features of her attacker. In her trial testimony, DiMeglio

never mentioned the attacker was wearing a cap; insisted he had no facial hair; and stated defendant could not have had a scar on his mouth.

In recounting the show-up, DiMeglio testified she was told police had someone matching the description of her attacker. They drove her to the park. She viewed the man standing between two police officers and she identified him as her attacker. DiMeglio stated she was "a thousand percent sure" because she remembered his face.

On cross-examination, DiMeglio admitted the events occurred "quick[ly]," taking "ten minutes." She stated she was extremely scared after her assailant struck her and it was dark. She also acknowledged that when she described her attacker to police she stated only that he was tall, black and wore a black shirt and blue jeans. Next, in giving her statement to police, she described the assailant as 5'8" or 6' and wearing a brown cap, black pants and brown shirt.

The jury returned a guilty verdict on both charges. Defendant appealed.

The Due Process Clause of the Fourteenth Amendment prohibits the admission of an unreliable out-of-court identification, which resulted from impermissibly suggestive procedures. Manson v. Brathwaite, 432 U.S. 98, 106, 97 S. Ct.

2243, 2249, 53 L. Ed. 2d 140, 149 (1976); see also United States v. Wade, 388 U.S. 218, 227-32, 87 S. Ct. 1926, 1932-35, 18 L. Ed. 2d 1149, 1157-60 (1967) (holding pretrial identification is a critical juncture in the course of a criminal prosecution). On one hand, eyewitness evidence is "inherently suspect"; however, on the other, it is "equally well recognized that in criminal actions an eyewitness's identification may be the most crucial evidence." State v. Madison, 109 N.J. 223, 232 (1998) (citation omitted), abrogated in part by State v. Henderson, 208 N.J. 208 (2011).

A sea change has recently occurred in the methodology for examining suggestive police identification procedures and ascertaining the reliability of resulting out-of-court identifications. See Henderson, supra, 208 N.J. at 288-99; State v. Chen, 208 N.J. 307, 327 (2011). Historically, courts followed the United States Supreme Court's two-part test to determine the admissibility of an eyewitness's out-of-court photographic identification, set forth in Manson v. Brathwaite, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977), which was adopted by the New Jersey Supreme Court in State v. Madison, 109 N.J. 223 (1988).

In Manson, the Highest Court expounded on the test initially identified in Simmons v. United States, 390 U.S. 377,

88 <u>S. Ct.</u> 967, 19 <u>L. Ed.</u> 2d 1247 (1968), which requires a court to determine whether the out-of-court photographic identification procedures used were impermissibly suggestive. <u>Manson</u>, <u>supra</u>, 432 <u>U.S.</u> at 114, 97 <u>S. Ct.</u> at 2253, 53 <u>L. Ed.</u> 2d at 154. If so, the court then must examine whether the objectionable procedure resulted in "a very substantial likelihood of irreparable misidentification." <u>Id.</u> at 116, 97 <u>S. Ct.</u> at 2254, 53 <u>L. Ed.</u> 2d at 155. When examining a challenge to the admissibility of identification testimony, a court must assess whether the impermissibly suggestive procedures used by law enforcement prejudicially affected the identification, by weighing five factors to "'determine whether . . . sufficient indicia of reliability'" would "'outweigh the "corrupting effect of the suggestive identification itself."'" <u>Madison</u>, <u>supra</u>, 109 <u>N.J.</u> at 239 (quoting <u>State v. Ford</u>, 79 <u>N.J.</u> 136, 137 (1979) (quoting <u>Manson</u>, <u>supra</u>, 432 <u>U.S.</u> at 114, 97 <u>S. Ct.</u> at 2253, 53 <u>L. Ed.</u> 2d at 154)). These factors "include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." <u>Manson</u>, <u>supra</u>, 432 <u>U.S.</u> at 114, 97 <u>S. Ct.</u> at 2253, 53 <u>L. Ed.</u> 2d at 154.

 A-0173-12T3

Underscoring "that reliability is the linchpin in determining the admissibility of identification testimony[,]" Chen, supra, 208 N.J. at 318 (quoting Manson, 432 U.S. at 114, 97 S. Ct. at 2253, 53 L. Ed. 2d at 154), we note any reliability determination must be made after assessing "the totality of the circumstances adduced in the particular case." Madison, supra, 109 N.J. at 233 (citing Neils v. Biggers, 409 U.S. 188, 199, 93 S. Ct. 375, 382, 34 L. Ed. 2d 401, 411 (1972)).

After Madison, the Court again considered eyewitness identification challenges in State v. Delgado, 188 N.J. 48 (2006). Noting "[m]isidentification is widely recognized as the single greatest cause of wrongful convictions in this country[,]" id. at 60, the Court chose to exercise its supervisory powers, granted by Article VI, Section 2, Paragraph 3 of the New Jersey Constitution, "to require, as a condition to the admissibility of out-of-court identifications, that the police record, to the extent feasible, the dialogue between the witnesses and police during an identification procedure." Id. at 51. The Court held the admissibility of out-of-court identifications was conditioned upon the preparation of

> a written record detailing the out-of-court
> identification procedure, including the
> place where the procedure was conducted, the
> dialogue between the witness and the
> interlocutor, and the results. Preserving
> the words exchanged between the witness and

the officer conducting the identification procedure may be as important as preserving either a picture of a live lineup or a photographic array. When feasible, a verbatim account of any exchange between the law enforcement officer and witness should be reduced to writing. When not feasible, a detailed summary of the identification should be prepared.

[Id. at 63.]

By that time, "[t]he State's Attorney General ha[d] . . . recognized that eyewitness identification 'evidence is not fool-proof,' and made New Jersey the first state to adopt the United States Department of Justice's procedural recommendations to increase reliability in photo and live lineups." State v. Romero, 191 N.J. 59, 74 (2007) (citing Letter from Attorney General John J. Farmer, Jr., to All County Prosecutors et al., at 1 (Apr. 18, 2001) (accompanying Attorney General Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures)).

The Supreme Court revisited and comprehensively considered this thorny issue in State v. Henderson, 208 N.J. 208 (2011), which established a more detailed framework to examine the admissibility of out-of-court identification testimony, provide new guidelines to reduce the possibility of misidentification, offer a more adequate measure for reliability, and deter potential police misconduct. Id. at 288-99. However, this case

was decided before <u>Henderson</u>'s new rule of law took effect and remains subject to the prior rubric of <u>Manson/Madison</u>.[2]

Following our review, we conclude the motion judge erroneously found factual support satisfying the <u>Manson/Madison</u> factors and determined DiMeglio's out-of-court identification was reliable and admissible at defendant's trial. We determine the evidence of record insufficient to overcome the fact that suggestive identification procedures result in a "very substantial likelihood of irreparable misidentification." <u>Manson</u>, 432 <u>U.S.</u> at 116, 97 <u>S. Ct.</u> at 2254, 53 <u>L. Ed.</u> 2d at 155. Accordingly the out-of-court identification should have been suppressed.

Show-up procedures used to illicit identification are suggestive. <u>See</u> <u>State v. Herrera</u>, 187 <u>N.J.</u> 493, 504 (2006) (recognizing that "one-on-one show[-]ups are inherently suggestive[,]" because "the victim can only choose from one person, and, generally, that person is in police custody"). However, indicia of reliability results because the on or near-the-scene identification is made close in time to the event. <u>State v. Wilkerson</u>, 60 <u>N.J.</u> 452, 461 (1972). The procedure also facilitates efficient police work; consequently, the tool

---

[2] <u>See</u> <u>id.</u> at 220 (applying new test prospectively, from September 4, 2012).

has been found permissible. Ibid. Standing alone, a show-up is not considered impermissibly suggestive. Herrera, supra, 187 N.J. at 504. See also State v. Wilson, 362 N.J. Super. 319, 327 (App. Div.) ("[T]here is no question that there was suggestiveness present because the defendant was identified while seated and handcuffed in the back of a police car. However, such suggestive circumstances did not render the identification procedure per se improper and unconstitutional."), certif. denied, 178 N.J. 250 (2003).

Nevertheless, show-up procedures must be scrutinized to assure police conduct, direct and inadvertent, does not impermissibly suggest a result to the witness. In this matter, defendant challenged the procedure used, asserting police failed to satisfactorily comply with the Delgado recording requirements. The motion judge rejected this argument and found the identification procedures were properly executed, such that they "did not result in a substantial likelihood of irreparable misidentification." We cannot agree with such an assessment.

The only written record memorializing the show-up procedure is a brief mention in the July 9, 2010 police incident report:

> At that time [Officer] Martina detained the possible suspect until I was able to drive the victim to the suspect to see if she could make a positive [identification] on this possible suspect. Once I got to the location of the possible suspect, . . .

15

> DiMeglio related right away that he was the one who robbed her.

The limited comments recorded by police include DiMeglio's identification, but omit what she was told, her response, or a statement of the specific procedures employed to effectuate the show-up.

Officer Jackson testified at the Wade hearing that after Officer Martina encountered defendant, he "told the victim that [the officers] might have someone fitting the description and . . . asked her if she can take a ride with [him] so — see if she can make a positive [identification] on the person." However, DiMeglio stated she was told by police "they had apprehended [her assailant] and he was across the street in the park, and for me to take a look at him and to see if he was the man that mugged me." There is a difference in these two accounts, which displays exactly why a near-contemporaneous record of the procedure is required. Further, there is no evidence police instructed DiMeglio that the person located may not be her attacker; to the contrary the suggestion was the opposite, as she was told a suspect was apprehended.

Also critical to assessing suggestibility is a description of the manner in which defendant was detained. Here, it was learned at the Wade hearing uniformed police officers flanked defendant. Although not handcuffed, defendant was separated

16                                                    A-0173-12T3

from the others to focus DiMeglio's observation toward him alone.

We conclude the meagerness of detail recorded in this incident report does not fulfill Delgado's clear requirements. Delgado, supra, 188 N.J. at 63 (conditioning admissibility of out-of-court identifications on creation of a written record detailing "the out-of-court identification procedure"). See also Chen, supra, 208 N.J. at 320 (holding Delgado mandates a reasonable, contemporaneous and detailed account of identification procedure); State v. Adams, 194 N.J. 186, 202-03 (2008) (same). In mandating the specific procedures to be followed, the Court stressed, "[t]he importance of recording the details of what occurred at an out-of-court identification flows from our understanding of the frailty of human memory and the inherent danger of misidentification." Delgado, supra, 188 N.J. at 60. The record requirement protects a defendant's rights allowing examination of whether the procedure was impermissibly suggestive.

We next examine whether the identification was reliable. We conclude it was not sufficiently reliable and determine the motion judge's findings, articulated in support of the Manson/Madison factors, was flawed.

The judge found DiMeglio's identification reliable because: (1) DiMeglio "had a close physical one-on-one contact with . . . defendant and had ample opportunity to view him"; (2) DiMeglio's description of the incident was detailed and she "paid attention to the details of her assailant"; (3) "the show[-]up occurred almost immediately after the incident[,] defendant was wearing similar clothes[,] and was similar in appearance to [DiMeglio's] original description that she had made about ten minutes earlier"; (4) DiMeglio identified defendant with "one hundred percent" certainty; and (5) the identification was made "shortly after the incident, approximately ten minutes[,]" and only three or four blocks from the scene of the crime.

Despite DiMeglio's insistence she viewed her assailant before and throughout the attack, making her one-hundred and, later, one thousand percent certain defendant mugged her, the only consistent descriptive features given of the man who stole her purse was he was "tall" and "black." As to the attacker's height, DiMeglio stated her assailant was "tall" or "5'8" to 6'." It was Officer Martina, not DiMeglio, who suggested he remembered the radio call mentioning the suspect was "over six feet." We note defendant stands 6'4" tall, making him at least four and as much as eight inches taller than DiMeglio's described attacker. Other details provided by DiMeglio were

18                                                      A-0173-12T3

also vague and varied. When the 9-1-1 operator asked her to describe her attacker, DiMeglio first stated it was dark and mentioned he wore a black shirt, black pants, and a brownish windbreaker. That clothing description changed ten minutes later when she first spoke to police and gave a description that included "blue jeans" and a "dark shirt." After DiMeglio observed defendant in the park standing between the police officers, she adjusted her description to a "brown shirt," "black pants," and a "cap." During the <u>Wade</u> hearing, the clothing description was muddled, as DiMeglio stated the mugger wore "something black and something brown," and she added he wore a cap on his head. When pressed by defense counsel, DiMeglio, for the first time, stated the attacker "was smoking a cigar" — he had a "Black and Mild in his mouth"; had hair, although noting defendant as he sat in the courtroom was bald; had a scar on his mouth; and had "mean" eyes. By the time of trial, DiMeglio's description again changed and she related exactly what defendant wore when arrested, a black hoodie and brown pants.

The motion judge's finding that DiMeglio "paid attention to the details of her assailant" and offered an accurate description of her attacker is unfounded. Not only was the

clothing description wrong, defendant also had no scar on his face or mouth and was bald.

Further, there are several facts not discussed by the motion judge that impact the accuracy of DiMeglio's identification and undermine any finding of reliability. These include the darkness of the area, the suddenness of the attack, and the resulting stress of the assault. See Henderson, supra, 208 N.J. at 247 (citing Gary L. Wells, Applied Eyewitness-Testimony Research: System and Estimator Variables, 36 J. Personality & Soc. Pyschol. 1546, 1546 (1978)) (noting "distance, lighting, or stress" are variables capable of "affect[ing] and dilut[ing] memory and lead[ing] to misidentifications").

First, the area of the attack was dark. DiMeglio admitted it was after nightfall and there was only one streetlight in the area, located across the street. When she spoke to the 9-1-1 operator she stated she could describe the attacker's clothing, but offered no distinguishing features other than height and race. Interestingly, the only distinguishing features DiMeglio eventually revealed about her attacker were he had hair and a scar; neither of which corresponded with defendant's appearance.

Second, the attack was sudden, from behind, and was of brief duration. DiMeglio herself admitted, the assault was

"[n]ot too long," "it happened actually very quickly," and she was "shocked" and "[s]cared."

Another significant issue not addressed by the motion judge is the Court's prior discussions addressing "cross-racial impairment," that is, difficulty in "identifying members of another race[,]" which is "strongest when white witnesses attempt to recognize black subjects." State v. Cromedy, 158 N.J. 112, 120-21 (1999) (internal quotation marks and citation omitted). See also Romero, supra, 191 N.J. at 69 (discussing "the convincing social science data demonstrating the potential unreliability of cross-racial identifications of African-American defendants specifically"). "Research suggests that people generally are better able to identify persons who resemble themselves or who share familiar physical characteristics." Id. at 72-73 (citation omitted).

The vagueness and inaccuracy of DiMeglio's description illustrates this difficulty and casts doubt on her ability to perceive and describe her attacker. Rather than evaluate the inconsistencies evinced by the facts, the motion judge simply honed in on DiMeglio's statement she saw her attacker's face and was certain it was defendant. DiMeglio's confidence in her identification and the temporal proximity of the show-up cannot sufficiently mitigate against the other factors that weigh in

favor of a finding of unreliability.  See Adams, supra, 198 N.J. at 204.

The judge also erred in finding DiMeglio accurately described defendant's clothing.  In fact, the various clothing descriptions offered by DiMeglio were inconsistent and did not coincide with defendant's appearance on the night of the robbery.  Defendant's pants were brown not black or blue jeans.  Further, he wore a black hooded sweatshirt not a brown windbreaker.  It cannot be overlooked that DiMeglio modified her description of defendant's clothing over time.  After she saw him at the park, she changed the color of his pants.  During the Wade hearing, the black pants and brown windbreaker morphed to "something black and something brown."  This changed again at trial and she described her attacker wearing exactly what defendant wore when he was stopped.

We reject the State's notion these are "[s]mall differences" that are "immaterial."  The clothing description was the only specific detail DiMeglio offered to describe the assailant.  Yet, DiMeglio's shifting descriptions show she either did not initially perceive or could not recall what her attacker wore.  She continued to add details as time passed and those details, inexplicably, corresponded with other evidence the State presented on this issue.

A-0173-12T3

While we agree DiMeglio described the events of the attack, we find no support for the motion judge's finding she was able to give a "detailed description" of her attacker. Because of the importance of the identification testimony and the dearth of corroborating evidence to support reliability of her identification, the trial judge had an obligation to scrutinize the facts. See Romero, supra, 191 N.J. at 75 ("We believe that particular care need be taken in respect of this powerful evidence--the eyewitness."). Instead, the judge's critical findings are generally unsupported. We find unfounded the judge's determination that defendant "was wearing similar clothes and was similar in appearance [to] [DiMeglio's] original description . . . ." The only description DiMeglio gave of the features of her attacker that matched defendant was his race and an approximate, yet inaccurate, height range. DiMeglio's suggestion she had ample time to view her assailant is belied by the fact that the only distinguishing feature she accurately offered was the color of his skin.

Based on our review of the totality of the circumstances presented in this record, we conclude DiMeglio's show-up identification was unreliable. We find no basis to conclude she had an independent recollection of his appearance. In light of DiMeglio's inability to identify the features of her attacker

23                                                                     A-0173-12T3

except that he was "a tall black male," together with the suggestive show-up procedures, we conclude when DiMeglio viewed defendant, a tall black man, she concluded he assaulted her. Accordingly, the out-of-court identification is inadmissible. See Cherry, supra, 289 N.J. Super. at 517-18.

The denial of defendant's suppression motion is reversed. Defendant's conviction is vacated. Retrial is subject to any determination on the sufficiency of the State's remaining evidence.

We briefly address the two remaining challenges raised on appeal, in an effort to avoid possible repetition of error in the event of a retrial. First, we reject defendant's claim of prosecutorial misconduct and do not agree the State's summation equated to an impermissible call to arms. See State v. Buscham, 360 N.J. Super. 346, 364-65 (App. Div. 2003) (finding prosecutor's express plea to jury "to protect this child" was improper). Nor can it be said to amount to a plea to the jury to protect members of a specified group. See State v. Acker, 265 N.J. Super. 351, 356 (App. Div. 1993) (deeming inappropriate "the prosecutor's argument that it was the function of the jury to protect young victims of alleged sexual offenses as a group" and the implication jurors would violate their oaths by failing to convict the defendant), certif. denied, 134 N.J. 485 (1993).

There was no trial objection. When considering the "fair import" of the summation in its entirety, State v. Jackson, 211 N.J. 394, 409, the cited statement was not "so egregious that it deprived . . . defendant of a fair trial," State v. Frost, 158 N.J. 76, 83 (1999).

Finally, defendant argues Officer Martina's testimony that suspects "normally get rid of [the proceeds of a crime] so they can't be tied to the crime" was inadmissible lay opinion. Again, no objection followed this testimony. Despite the lack of objection, we conclude it was error to admit that statement and the error was "clearly capable of producing an unjust result." R. 2:10-2.

"Lay opinion testimony . . . can only be admitted if it falls within the narrow bounds of testimony that is based on the perception of the witness and that will assist the jury in performing its function." State v. McLean, 205 N.J. 438, 456 (2011). "[A] lay witness must have actual knowledge, acquired through his or her senses, of the matter to which he or she testifies." State v. LaBrutto, 114 N.J. 187, 197 (1989). Further, lay opinion "is limited to testimony that will assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue." McLean, supra, 205 N.J. at 458.

Although New Jersey courts have permitted police officers to testify as lay witnesses, LaBrutto, supra, 114 N.J. at 198, "[t]he Rule does not permit a witness to offer a lay opinion on a matter 'not within [the witness's] direct ken . . . and as to which the jury is as competent as he [or she] to form a conclusion[.]'" McLean, supra, 205 N.J. at 459 (alterations in original) (quoting Brindley v. Firemen's Ins. Co., 35 N.J. Super. 1, 8 (App. Div. 1953)).

Here, Officer Martina was not relating what he observed or perceived. See N.J.R.E. 701. Rather, he offered what amounted to an expert opinion interpreting facts for the jury bearing directly on defendant's guilt. The statement from a lay witness impermissibly intruded on the jury's function and is not admissible without an appropriate expert foundation. See McLean, supra, 205 N.J. at 463.

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION