**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3471-16T4

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

TAJMIR D. WYLES,

    Defendant-Respondent.

_____

Submitted October 3, 2017 — Decided October 13, 2017

Before Judges Yannotti and Carroll.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 16-06-1621.

Mary Eva Colalillo, Camden County Prosecutor, attorney for appellant (Linda A. Shashoua, Assistant Prosecutor and Jamie L. Hutchinson, Assistant Prosecutor, of counsel and on the brief).

Helmer, Conley & Kasselman, PA, attorneys for respondent (Jack J. Lipari, of counsel and on the brief).

PER CURIAM

    Defendant Tajmir Wyles is charged with murder in connection with the shooting death of Nicholas Rowser. By leave granted, the

State appeals from that portion of a March 10, 2017 order granting defendant's motion to suppress the out-of-court identification of defendant by A.T.,[1] a witness to the incident. The motion judge concluded that: A.T. lacked credibility; the State failed to establish that A.T. was familiar with defendant prior to the shooting; and defendant met his ultimate burden of showing a very substantial likelihood of misidentification. Finding no basis to disturb these determinations, we affirm.

## I.

In State v. Henderson, 208 N.J. 208, 288-99 (2011), our Supreme Court effected a "sea change . . . in the methodology for examining suggestive police identification procedures and ascertaining the reliability of resulting out-of-court identifications." State v. Smith, 436 N.J. Super. 556, 564 (App. Div. 2014). Under prior law, there was a two-step test for determining the admissibility of identification evidence; it required the court to decide whether the identification procedure in question was impermissibly suggestive and, if so, whether the objectionable procedure resulted in a "very substantial likelihood

_____

[1] We use initials in this opinion to protect the privacy of the witnesses to the crimes with which defendant is charged. The March 10, 2017 order denied defendant's motion to suppress the out-of-court identification of defendant by a second witness, J.I. That identification is not at issue in this appeal.

of irreparable misidentification." State v. Madison, 109 N.J. 223, 232 (1988) (quoting Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 971, 19 L. Ed. 2d 1247, 1253 (1968)). To assess reliability, the court considered five factors: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated at the time of the confrontation; and (5) the time between the crime and confrontation. Id. at 239-40. These reliability factors were then balanced against the "corrupting effect" of the suggestive identification. Henderson, supra, 208 N.J. at 238 (quoting Manson v. Braithwaite, 432 U.S. 98, 114, 97 S. Ct. 2243, 2253, 53 L. Ed. 2d 140, 154 (1977)).

In Henderson, the Court relied upon current social science research and studies to expand the number of factors informing the reliability of identification evidence and to provide trial courts guidance and explanation as to how to analyze those factors. Specifically, the Court identified eight "system variables," defined as characteristics of the identification procedure over which law enforcement has control. Id. at 248-61. These variables are: 1) whether a "blind" or "double blind" administrator is used; (2) whether pre-identification instructions are given; (3) whether the lineup is constructed of a sufficient number of fillers that

3

look like the suspect; (4) whether the witness is given feedback during or after the procedure; (5) whether the witness is exposed to multiple viewings of the suspect; (6) whether the lineup is presented sequentially versus simultaneously; (7) whether a composite is used; and (8) whether the procedure is a "showup." Ibid.

The Court also identified ten "estimator variables," defined as factors beyond the control of law enforcement which relate to the incident, the witness, or the perpetrator. Id. at 261. These variables are: (1) the stress level of the witness when making the identification; (2) whether a visible weapon was used during the crime; (3) the amount of time the witness viewed the suspect; (4) the lighting and the witness's distance from the perpetrator; (5) the witness's age; (6) whether the perpetrator wore a hat or disguise; (7) the amount of time that passed between the event and the identification; (8) whether the witness and perpetrator were different races; (9) whether the witness was exposed to co-witness feedback; and (10) the speed with which the witness makes the identification. Id. at 261-72.

Henderson prescribed a four-step procedure for determining admissibility of identification evidence. Id. at 288-89. First, to obtain a hearing, defendant has the burden of producing some evidence of suggestiveness, tied to a system rather than estimator

A-3471-16T4

variable, that could lead to a mistaken identification.  Ibid.

Second, the State must offer proof the identification is reliable,

"accounting for system and estimator variables[.]"  Id. at 289.

Third, the burden remains on the defendant "to prove a very

substantial likelihood of irreparable misidentification."  Ibid.

And, fourth, if defendant sustains his burden, the identification

evidence should be suppressed; if defendant does not sustain his

burden, the evidence should be admitted with "appropriate,

tailored jury instructions[.]"  Ibid.

## II.

It is in the context of this legal landscape that we review

the motion record.  On February 7, 2016, Rowser was fatally shot

on Morton Street in Camden.  At approximately 3:30 p.m. that day,

A.T. exited her apartment on Morton Street and headed across the

street toward a friend's vehicle.  There, A.T. noticed an African

American man with dreadlocks proclaim "they fucking robbed me."

Approximately five to ten minutes later, A.T. heard multiple

gunshots, although she did not actually observe the shooting.  She

then saw the same African American man run from the scene.  A.T.

informed a nearby police officer she believed the suspected shooter

had dreadlocks.

The next day, detectives interviewed A.T. at the Camden County

Prosecutor's Office (CCPO).  A.T. stated her boyfriend, J.I., told

her the shooter's nickname was "Fatboy." A.T. provided a description of the suspect, approximating his weight, height, length of hair, and the clothing he was wearing. The detectives showed A.T. a single photograph of defendant, and A.T. identified him as the shooter.

Defendant was thereafter indicted for first-degree murder, N.J.S.A. 2C:11-3a(1)(2), and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4a. Defendant moved to suppress A.T.'s out-of-court identification. Relying on State v. Farrow, 61 N.J. 434 (1972), cert. denied, 410 U.S. 963, 93 S. Ct. 1396, 35 L. Ed. 2d 602 (1973), the State argued that A.T. generally knew defendant from the neighborhood and accordingly her identification of defendant from a single photograph was merely confirmatory. In rejecting this contention, the motion judge indicated he could not "square the proposition that [A.T.] actually knew [defendant] with her clear statement . . . where she said that he was not a familiar face." The judge added: "She wouldn't have said he's not a familiar face if she knew him, it seems to me." Consequently, the State could not "avail itself of the confirmation process approved [in] Farrow."

The judge determined that "this identification by [A.T.] must be treated as a single photo show-up procedure," which although not per se unconstitutional, is "inherently suggestive" (citing

Henderson, supra, 208 N.J. at 259).  The judge then focused on the

system variables identified in Henderson and made the following

detailed findings:

> Here, approximately [eighteen] hours elapsed from the time of the shooting to the interview and show-up procedure.  [A.T.] was not given the pre-identification instructions regarding the photograph, and received information from . . . a private actor, her boyfriend, [J.I.], concerning the . . . name of the man she saw. . . .
>
> Furthermore, though [A.T.] repeatedly mentioned [J.I.]'s statements concerning the suspect made to her, [A.T.], the police apparently failed to investigate the extent of the discussion and the detail involved.
>
> Considering the system variables in this particular light, I will note, first of all, with respect to blind administration, this apparently was not done.  It appears that the officers knew who the suspect[] [was]; ultimately, showed her a single photograph of the suspect, and so that cuts against reliability of the identification.  I give . . . that factor high weight.
>
> In terms of pre-identification instructions, [A.T.] was not given pre-identification instructions.  So again, that cuts against reliability.  I give that high weight.
>
> In terms of lineup construction, that's not applicable, because there was no lineup.
>
> In terms of feedback, whether the officers gave feedback about the suspect or the crime before[,] during[,] or after the identification procedure, arguably, there was some done here . . . that cuts against

reliability, but based on [] the nature of it, I give it low weight.

In terms of recording confidence, that wasn't done here, one way or the other, although the whole statement was recorded. So we do have the benefit of that, and that can be just judged broadly from what is observed from the video and [] what I have seen so far from the transcript.

And as to the way it was done, though, where it wasn't expressly asked of the witness for her to state in particular her level of confidence, that cuts against reliability. But I give it low weight, given the fact that we can otherwise observe and hear her statements, and I've read her statements.

In terms of multiple viewings, did the witness view the suspect more than once as part of multiple identification procedures? No. So that favors reliability, but I give it low weight. And the sub-part of that is about the use of fillers, which does not apply.

Show-ups. Did the police perform a show-up more than two hours after the event. Yes, they did. This was some [eighteen] hours later. If it was within [two] hours there was [] very little problem about unreliability, but this was more than [two] hours, so we're not in that realm.

The sub-part of this is whether the police warned the witness that the suspect may not be the perpetrator, and that the witness should not feel compelled to make an identification. That was not done. All this cuts against reliability. I give that high weight.

In terms of private actors, whether the law enforcement officers elicited from the witness whether he or she had spoken with anyone about

8

the identification; and, if so what [was] discussed? Well, it was apparent that [A.T.] was interacting with her boyfriend, a private actor. She mentioned this; [the police] didn't pursue it to flesh that out.

In terms of to what extent it might affect [A.T.'s] ability to identify from her personal knowledge, this photograph is being the photograph of the actual perpetrator, and so that cuts against reliability. I give that high weight.

In terms of other identifications made, [A.T.] didn't make any other identifications or choose any other suspect. Of course, she wasn't shown any more than one photograph, but she didn't otherwise suggest there was somebody else. And she did say this photograph was the right person. So she did not identify other people. That favors reliability. But since it was done the way it was done, with one photograph only, I give it low weight.

The judge concluded that defendant made a threshold showing of some evidence of suggestiveness that could lead to a misidentification, "thereby entitling [him] to an evidentiary hearing, the next step under Henderson."

The court conducted an evidentiary hearing on February 22 and 23, 2017, at which A.T. and CCPO Detective James Brining testified. The court also viewed the video recording of A.T.'s out-of-court identification. The judge concluded that A.T. "was substantially lacking in credibility." He elaborated:

Her testimony was rambling and sometimes unresponsive to questions. She admitted that

in her statement to the police she made numerous assumptions not based on personal observations or knowledge. She admitted some of her statements to police, especially early on, were untruthful.

Her statement to police was internally inconsistent, at first saying the perpetrator was not . . . a familiar face, then later saying she had seen him before in the neighborhood. She stated that . . . she obtained some of her knowledge of what she knew about the perpetrator from her boyfriend [J.I.], and further stated other things that he knew about [] defendant, such as his nickname Fatboy, but she was unconvincing in her efforts to separate what she gleaned from him and what she knew of her own account.

She also stated that at her interview she was shown multiple photographs . . . when, in fact, she was shown one, that of the defendant, as evidenced by the video of her statement.

She was, at the time of the statement, under indictment in Camden County and was intercepted in court by law enforcement officers and taken to the [CCPO] for questioning regarding this matter.

The judge next proceeded to analyze the estimator variables identified in Henderson. He first found that the unexpected mid-day shooting involving multiple gunshots involved a high level of stress and decreased the reliability of the identification. Second, the judge noted that A.T. did not observe a weapon at the time of the shooting. This factor increased the reliability of the identification. Third, A.T.'s observation of the criminal

suspect was for a "relatively short duration[,] [which] cuts against reliability." Fourth, as to distance and lighting, the judge found it was daylight, which favored reliability, but "the distance across the street wasn't close," which did not. Fifth, there was no evidence that A.T. was under the influence of drugs or alcohol or in a state that "undercut her reliability or ability to perceive[,]" which favored reliability. Sixth, A.T. was age twenty-nine when she witnessed the shooting, which also favored reliability. Seventh, as to characteristics of the criminal suspect, the perpetrator was not wearing a disguise in his commission of the criminal act. This too favored reliability.

The judge next addressed the accuracy of a witness's memory during a show-up identification occurring more than two hours after the criminal incident. Drawing on Henderson, supra, 208 N.J. at 259-60, the judge noted that "memory decay is a problem" in that context.

Regarding racial bias, the judge recognized that A.T. is Caucasian and defendant is African American. However, the judge deemed the potential for cross-racial bias less significant in this case because many African Americans live in A.T.'s neighborhood. Thus, racial bias weighed only slightly against the reliability of the identification.

Next, A.T.'s description of defendant was "generally accurate" and favored reliability. Finally, while A.T. immediately identified defendant in the photo, she did not verbally indicate her certainty as to same. Notwithstanding, the court found that the immediacy of the identification weighed in favor of reliability.

The judge then "weigh[ed] the system and estimator variables quantitatively and qualitatively, under the totality of the circumstances." He concluded the State "failed to show that the identification is still reliable," and defendant "met his ultimate burden of showing a very substantial likelihood of misidentification." The judge entered an order suppressing A.T.'s out-of-court identification of defendant. This appeal followed.

III.

Our standard of review on a motion to bar an out-of-court identification "is no different from our review of a trial court's findings in any non-jury case." State v. Wright, 444 N.J. Super. 347, 356 (App. Div.) (citing State v. Johnson, 42 N.J. 146, 161 (1964)), certif. denied, 228 N.J. 240 (2016). We are bound to uphold the motion judge's factual findings as long as they are supported by sufficient credible evidence in the record. State v. Gonzalez, 227 N.J. 77, 101 (2016). This deference is grounded in the understanding that our "reading of a cold record is a pale

substitute for a trial judge's assessment of the credibility of a witness he has observed firsthand." State v. Nash, 212 N.J. 518, 540 (2013).

However, "[d]eference ends when a trial court's factual findings are not supported by sufficient credible evidence in the record." State v. S.S., 229 N.J. 360, 381 (2017). We also do not defer to the trial judge's legal conclusions. State v. Gorthy, 226 N.J. 516, 530 (2016). We review legal decisions de novo. State v. Tate, 220 N.J. 393, 405 (2015).

Before us, the State contends the motion judge was confused by A.T.'s statement that defendant was "not a familiar face." The State submits that A.T. intended to say defendant was not a "familiar face" among the drug dealers who plied their trade across the street from her home. It is the State's position that this misinterpretation caused the judge to incorrectly conclude that A.T. was not merely making a "confirmatory identification." Again relying on Farrow, supra, 61 N.J. at 453, the State argues the judge erred in applying the identification procedures of Henderson, and there was no need for a further hearing to assess the Henderson factors where, as here, the witness actually knew the perpetrator. We are not persuaded.

Specifically at issue here is that portion of A.T.'s February 8, 2016 recorded interview in which she stated:

> And he goes, I heard him straight up say I was
> just robbed. He's like they fucking robbed
> me. So I kind of look 'cause I was [] like I
> know he's not a familiar face, like I know, I
> know there's a lot of people that stand out
> across the street. They'll literally always
> stand directly across from my street, but I
> know I never really seen [him], like seen him
> like um, like there.

Clearly this statement was sufficient to give the motion judge pause to question the degree of A.T.'s familiarity with defendant. In light of the inherent suggestibility of a show-up in which A.T. was presented with a single photograph of defendant more than two hours after the event,[2] the fact she was not given pre-identification instructions or told the photo might not depict the perpetrator, and was given information about the shooter by her boyfriend that may have tainted her own personal perception, these factors in combination clearly entitled defendant to an evidentiary hearing.

After hearing A.T.'s testimony and observing her demeanor, the judge found her "substantially lacking in credibility." As we have noted, the judge carefully enumerated several reasons supporting his credibility assessment. He recognized that A.T. "indicated that she was not entirely truthful with everything that

---

[2] See Henderson, supra, 208 N.J. at 261 ("showups, while sometimes necessary, are inherently suggestive").

she said during her recorded statement and that she also, from time to time, was making assumptions of facts in things she set forth during her recorded statement." Specifically, A.T. asked the detectives "'Does this seem about right?' or words to that effect[,]" with regard to her interview testimony. She also told the detectives she "<u>hoped</u> [] she could pick [the suspect] out of a photo array." (Emphasis added). Finally, A.T. incorrectly testified she was shown several photographs of suspects, maybe five, before she identified defendant as the shooter, when indisputably she was only shown defendant's photo.

Mindful that we are reviewing a cold record and that the trial court's factual findings are "entitled to very considerable weight," <u>State v. Adams</u>, 194 <u>N.J.</u> 186, 203 (2008), we are loathe to disturb the judge's credibility findings. Given A.T.'s perceived lack of credibility, we are thus unable to accept the interpretation of A.T.'s statement urged on us by the State, that her identification of defendant was merely confirmatory.

The judge properly went on to identify and balance the various system and estimator variables within the <u>Henderson</u> framework. The judge correctly followed the totality of the circumstances approach that <u>Henderson</u> requires when evaluating the admissibility of identification evidence. We conclude there is no basis for disturbing the judge's conclusion that defendant established "a

15

very substantial likelihood of irreparable misidentification." That conclusion is supported by substantial credible evidence in the record and a proper application of <u>Henderson</u>.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3471-16T4