**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2524-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ONDRE H. WEEKES, a/k/a
ANDRE WEEKS,

     Defendant-Appellant.

_____

Argued September 13, 2021 – Decided October 5, 2021

Before Judges Mayer and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 16-04-1358.

Kevin S. Finckenauer, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Kevin S. Finckenauer, of counsel and on the briefs).

Caitlinn L. Raimo, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens II, Acting Essex County Prosecutor, attorney; Caitlinn L. Raimo, of counsel and on the brief).

PER CURIAM

Tried to a jury, defendant Ondre H. Weekes appeals his convictions for robbery, N.J.S.A. 2C:15-1(a)(1), unlawful possession of a weapon, N.J.S.A. 2C:39-5(d), and possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d), arguing:

> I. THE TRIAL COURT MISCONSTRUED CRITICAL FACTS DURING THE [UNITED STATES V. WADE, 388 U.S. 218 (1967)][1] HEARING AND IMPROPERLY PERMITTED THE EYEWITNESS IDENTIFICATION AT TRIAL, THE COURT FAILED TO GIVE AN INSTRUCTION THAT THE OFFICERS' FAILURE TO RECORD THE EYEWITNESS PROCEEDING COULD BE USED IN EVALUATING THE CREDIBILITY OF THE EYEWITNESS'S TESTIMONY.
>
> A. The Trial Court Was Mistaken as to, or Omitted, Critical Facts Regarding the Admissibility of the Showup Identification.
>
> B. The Trial Court Failed to Give an Instruction with Respect to the Officer's Failure to Record the Identification Procedure.
>
> C. The Admission of the Showup Identification and the Subsequent Failure to Give an

---

[1] A Wade hearing is conducted for the purpose of determining whether an out-of-court identification was made in unduly suggestive circumstances and, if so, whether or not any ensuing in-court identification procedure would be fatally tainted thereby. State v. Henderson, 208 N.J. 208, 238 (2011).

Appropriate Instruction Caused Irreparable Harm.

II. THE 911 CALLS ADMITTED AT TRIAL VIOLATED [DEFENDANT'S] RIGHT TO CONFRONT HIS ACCUSER AND OTHERWISE CONSTITUTED INADMISSIBLE HEARSAY.

A. Admission of the 911 Calls at Trial Violate[d] [Defendant's] Constitutional Right to Confront his Accusers.

B. The 911 Callers' Regurgitation that Cantine Had Been Stabbed are Hearsay with No Applicable Exception.

C. The Admission of the Multiple References to Cantine Stating He Had Been Stabbed Caused Irreparable Harm.

III. THE SENTENCING COURT USED IMPROPER FACTS IN WEIGHING AGGRAVATING AND MITIGATING FACTORS, FAILED TO ADDRESS RELEVANT MITIGATING FACTORS RAISED BY TRIAL COUNSEL, AND ERRED IN DENYING DEFENDANT'S MOTION TO SENTENCE THE FIRST-DEGREE ROBBERY AS A SECOND-DEGREE OFFENSE. ADDITIONALLY, THE NEW YOUTH MITIGATING FACTOR MUST BE GIVEN RETROACTIVE EFFECT.

A. The Trial Court Improperly Relied on Dismissed Charges and Charges for which [Defendant] was Acquitted in Finding the Applicable Aggravating Factors, Relied on Facts Rejected by the Jury in Refusing to Apply Mitigating Factors, Failed to Address

A-2524-18

the Documented Mental Health Issues Raised by [Defendant], and Improperly Rejected [Defendant's] Other Mitigating Arguments.

B. The Law Requiring Sentencing Mitigation for Youthful Defendants Demands a Retroactive Application Because the Legislature Intended It, the New Law is Ameliorative in Nature, and Fundamental Fairness Requires Retroactivity.

   I. THE LEGISLATURE DID NOT EXPRESS A CLEAR INTENT FOR PROSPECTIVE APPLICATION.

   II. THE OTHER LANGUAGE OF THE MITIGATING FACTOR INDICATES RETROACTIVE APPLICATION; THE PRESUMPTION OF PROSPECTIVE APPLICATION IS INAPPLICABLE; AND THE LAW IS CLEARLY AMELIORATIVE.

   III. THERE IS NO MANIFEST INJUSTICE TO THE STATE IN APPLYING THE MITIGATING FACTOR RETROACTIVELY.

   IV. RETROACTIVE APPLICATION OF THE MITIGATING FACTOR IS REQUIRED AS A MATTER OF FUNDAMENTAL FAIRNESS, AND TO EFFECTUATE THE REMEDIAL PURPOSE OF THE SENTENCING COMMISSION'S EFFORTS REGARDING JUVENILE SENTENCING.

C. UNDER A PROPER ANALYSIS OF THE AGGRAVATING AND MITIGATING FACTORS, AND CONSIDERING THE CIRCUMSTANCES OF THE OFFENSE, THE SENTENCING COURT SHOULD HAVE CONCLUDED THAT [DEFENDANT'S] FIRST-DEGREE ROBBERY CHARGE SHOULD BE SENTENCED AT A SECOND-DEGREE OFFENSE.

We have reviewed and considered each of these arguments in light of the entire record and the applicable law. For the reasons that follow, we affirm defendant's convictions and sentence.

I.

We derive the following facts from the testimony provided at defendant's Wade hearing and jury trial. On February 5, 2016, at approximately 6:00 p.m., while skateboarding to a friend's house, seventeen-year-old Zafar Cantine was flagged down by defendant. Defendant asked Cantine if he could borrow his phone to call his girlfriend, because he had been locked out of his house.

Cantine gave defendant his cellphone and observed him dialing, but grew concerned after he noticed that defendant was not typing "full ten digit[]" numbers. Cantine thought defendant was "faking," and he was now in a "bad situation." Cantine accordingly backed away from defendant and stood approximately three feet away from him. Defendant asked Cantine if he wanted

5

anything out of his bookbag which Cantine declined because he believed defendant was referring to illegal narcotics.

After defendant attempted to dial another number, he put the phone into his jacket pocket and placed his hand into the bookbag. Defendant told Cantine to "be cool," and proceeded to pull out a kitchen knife, and swung it at him. Cantine successfully blocked defendant's attempt and the knife did not pierce his clothing or skin.

Cantine testified that defendant was wearing "dark clothing" and gray Nike Jordans, and that defendant was "pretty tall compared to [him]." Cantine further explained that defendant was holding his cellphone by his waist and the light from the phone was shining on defendant's face during this encounter.

Defendant fled the scene and Cantine initially chased after him until he realized that defendant still had a knife. Cantine then stopped a vehicle, explained to the driver that he had just been robbed, and asked her to call the police. The driver, however, pulled away, which led Cantine to believe that she had not called the police. The driver did, however, call 911 and the call was played at trial.[2] The pertinent portions relevant to this appeal are as follows:

---

[2] Prior to playing the 911 calls at trial, the court redacted the recordings to eliminate extraneous portions, background audio, and certain, but not all, statements erroneously reporting that Cantine was stabbed.

Driver: [A] kid stopped me and said someone tried to stab him and then ran away and he asked me to call the cops.

. . . .

Operator: Okay, yeah, the police are out there now. Did you see him or you just kept going?

Driver: I just . . . I stopped and he . . . and he was, like, running . . . .

. . . .

Operator: What did he look like, ma'am?

Driver: African-American, he had long hair, maybe in dreads. He was wearing a black coat and maybe a black hat.

Operator: Okay. Okay, yes, the police are out with him now. Thank you so much for calling. He didn't give you any information on the suspect, did he?

Driver: No.

Cantine then went to a nearby hair salon and again explained that he had just been robbed and requested that an employee call the police, which she did. The following portions of that 911 call were also played at trial:

Caller: Hi, I have someone in front of my business place . . . He said somebody stabbed him.

Operator: Somebody what? You're in Maplewood?

. . . .

7

Caller: Yes. He just talked to me because I don't want to open the door because I don't know him.

Operator: . . . Do you see any blood on him?

Caller: I don't see any blood on him.

Operator: . . . They have a black male wearing a green and blue puffy jacket. Supposedly he got stabbed. No information on the suspect.

. . . .

Operator: Alright, is he doing anything? Is he on the ground? Is he leaning or?

Caller: No, he's just . . . he's just standing, he's just standing.

Operator: He's just standing? You don't see any blood? I have officers on the way there now.

Caller: No, I can't see any blood.

Operator: Okay. Just let me know if anything changes, okay?

Caller: Oh, the officer just pulled up. Yeah they just pulled up.

. . . .

Operator: Okay is he still there?

Caller: Yeah he's talking to them.

A-2524-18

Officer Sean Gearren of the Maplewood Police Department ("MPD") was dispatched to the hair salon. Cantine provided a "basic description" of defendant to him, stating that he was "a black male, approximately [six feet] in height with chin length dreadlock[] style hair wearing a dark multicolored jacket along with a black bag." Officer Gearren then relayed this description to surrounding units. Within minutes after providing the description, Officer Gearren was notified that officers had located a possible suspect.

Officer Ilir Gjatollari was parked at a red light searching the surrounding area when he saw defendant and proceeded to follow him to confirm he matched the description provided by Officer Gearren. Officer Gjatollari exited his vehicle, approached defendant, and told defendant that he needed to "talk to [him] for a second."

Officer Gjatollari stated defendant attempted to flee, but changed directions, and ran towards him. Officer Gjatollari, believing he was in danger, stated he unholstered his firearm and ordered defendant to stop. According to Officer Gjatollari, defendant ignored his instruction and ran past him. Officer Gjatollari was able to holster his weapon, and grab the handle of defendant's book bag with his left hand.

At this point, both Officer Gjatollari and defendant fell to the ground. Officer Gjatollari testified that he had to use force and punched defendant "[i]n the shoulders and in the back" to restrain him as defendant was flailing his arms. Another officer arrived at the scene and defendant was brought to a patrol vehicle where he was searched and placed into custody. A subsequent search of defendant's bookbag uncovered a "collection of knives," a cell phone, pills, and marijuana.

After Officer Gearren was informed that a potential suspect was detained, he asked Cantine if he was "comfortable enough to do a show up" and that he "would bring him down to the scene where the subject was stopped." Cantine agreed.

Cantine and Officer Gearren both testified regarding that identification at the Wade hearing. Officer Gearren recounted that when he initially spoke with Cantine, Cantine provided a description of the man who robbed him as a "black male, approximately [6'1"] height, chin length dreadlocks with a mustache wearing black sweatpants and black and grey sneakers carrying a black bookbag." Officer Gearren then relayed that description over his radio and within five or seven minutes he received word that a suspect had been detained.

Cantine and Officer Gearren both explained that they traveled to the suspect's location in a police vehicle. Officer Gearren noted that the location where defendant was stopped was "at most seven blocks" away and took "[l]ess than a minute" to arrive. Moreover, both Cantine and Officer Gearren testified that no one spoke in the patrol vehicle as Cantine was taken to defendant's location.

Officer Gearren testified that when they arrived at the scene, he instructed Cantine that "if [he] could make an identification, go ahead. If it's not the subject from your incident, you know, advise us." Consistent with his testimony at trial, Officer Gearren stated that he parked his vehicle approximately thirty to forty feet away from defendant, and that Cantine had an unobstructed view of defendant. Officer Gearren stated that there were streetlights on, and his patrol vehicle's headlights and floodlights were facing the direction of defendant, who was handcuffed and standing alongside two officers and a marked patrol vehicle.

Cantine also testified that when he arrived, he saw defendant "in the middle of the street with his hands behind his back" and then the officers "shined a flood light on him so [he] could see [defendant] clearly." Cantine stated at that point he "recognized [defendant's] clothing" specifically his "Jordans that stuck out and the dark pants that he was wearing that day."

A-2524-18

Cantine testified that after he had identified the suspect police showed him a phone and a knife that they recovered from defendant's bookbag. Cantine unlocked the phone and confirmed that it was his. He then identified the knife as the one used in the robbery.

Officer Gearren also completed a "showup identification procedures worksheet" on the day of the incident. The form indicated that Officer Gearren had instructed Cantine "that the actual perpetrator may or may not be in procedure or showup and that the witness should not feel compelled to make an identification." The form also noted that Officer Gearren instructed Cantine "not to discuss identification procedure, whether an identification was made or not, with any other witness or witnesses, or obtain information for other sources." Finally, the form acknowledged that Cantine made a positive identification based on defendant's "mustache . . . and the gray sneakers." Despite the fact that multiple police vehicles involved were equipped with dashboard cameras, the MPD failed to preserve any recordings depicting the arrest or identification process.

On May 7, 2018, the court denied defendant's motion to suppress Cantine's showup identification. In its accompanying oral decision issued on May 11, 2018, the court addressed the applicable system variables delineated in State v.

12

Henderson, 208 N.J. 208 (2011).[3]  First, the court found that Officer Gearren

provided Cantine with appropriate pre-identification instructions.  Specifically,

the court concluded that he advised Cantine "that the person detained may or

may not be the perpetrator" and that he "should not feel compelled to make an

identification."   The court also concluded that Cantine "was not given any

information about defendant" and that the showup occurred "within a reasonable

time . . . shortly after the incident."

With respect to the estimator variables,[4] the court determined that

"initially there was not a high level of stress, because the victim thought the

---

[3] System variables are factors "within the control of the criminal justice system."
Henderson, 208 N.J. at 218.  They are:  (1) whether a detective uninvolved in
the investigation – a "blind" administrator – was used; (2) whether pre-
identification instructions were given to the witness; (3) whether the array was
constructed of a sufficient number of fillers that look like the suspect; (4)
whether the witness was given feedback either during or after the procedure; (5)
whether the witness was exposed to multiple viewings of the suspect; (6)
whether the lineup was presented sequentially versus simultaneously; (7)
whether a composite sketch was used; (8) whether the procedure was a show-up
where "a single suspect is presented to a witness to make an identification."  Id.
at 248-61.

[4]  "[E]stimator variables are factors beyond the control of the criminal justice
system," Henderson, 208 N.J. at 261, and include:  (1) the witness's stress level;
(2) whether a visible weapon was used during the crime; (3) the amount of time
the witness viewed the suspect; (4) the lighting and the witness's distance from
the perpetrator; (5) the witness's age and level of intoxication; (6) whether the
perpetrator wore a disguise or changed physical features; (7) the amount of time

defendant was merely borrowing his phone to make a phone call." The court also concluded that Cantine and defendant's initial interaction was not weapon "focused" and Cantine had a "reasonable amount of time to observe the defendant." In addition, the court found that Cantine was in close proximity to defendant and was not under the influence of any substances. The court then noted that defendant was not wearing a mask, there was no memory decay, or cross-racial identification. Finally, the court found that Cantine had an ample opportunity to view defendant's physical characteristics and had a "good degree of attention."

On June 4, 2020, the court issued an amended order and written statement of reasons. In its decision, the court again relied on Henderson which it explained "promulgated the guidelines for courts in analyzing the admissibility of eyewitness identifications." In addition to the conclusions discussed in its prior oral opinion, the court determined that "[n]o evidence was presented that Cantine received any feedback about the suspect before, during, or after the identification procedure." The court noted that Officer Gearren testified that he

_____

that passed between the crime and the identification; (8) whether the witness and perpetrator were of different races; (9) whether the witness was exposed to co-witness feedback; and (10) the speed with which the witness made the identification. Id. at 261-72.

did not converse with Cantine during the drive to the suspect's location and that Cantine testified that he "did not recall [Officer] Gearren saying anything to [him] during the drive." The court also found that "the showup was "conducted within a little less than one half hour from the time of the incident."

Defendant was charged with: 1) first-degree robbery (count one); 2) second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (count two); 3) three counts of fourth-degree aggravated assault of a police officer, N.J.S.A. 2C:12-1(b)(5)(A) (counts three through five); 4) fourth-degree unlawful possession of a weapon (count six); 5) third-degree possession of a weapon for an unlawful purpose (count seven); 6) fourth-degree possession of a controlled dangerous substance with intent to distribute, N.J.S.A. 2C:35-5(a)(1),(b)(12) (count eight); 7) third-degree possession of clonazepam without a prescription, N.J.S.A. 2C:35-10.5(e) (count nine); 8) third-degree possession of promethazine without a prescription, N.J.S.A. 2C:35-10.5(e) (count ten); 9) third-degree resisting arrest by use or threat to use physical force, N.J.S.A. 2C:29-2(a)(3)(A) (count eleven); and 10) fourth-degree resisting arrest by flight, N.J.S.A. 2C:29-2(a)(2) (count twelve).

As noted, the jury convicted defendant of first-degree robbery, unlawful possession of a weapon, and possession of a weapon for unlawful purposes, and

A-2524-18

found defendant not guilty of aggravated assault, resisting arrest by force, and resisting arrest by flight. The State dismissed the remaining charges.

At sentencing, defendant requested the court consider his mental health issues as a mitigating factor. Specifically, defendant's counsel stated that defendant "suffered from post-traumatic stress disorder" and that even though there "hasn't been any testimony to it . . . under the stress of the situation, [defendant] reacted in a way he shouldn't have reacted." In addition, defendant alleged he has "a documented history of mental issues" resulting from a hit and run accident and a shooting where "he saw his best friend murdered."

The court found applicable aggravating factor three, the risk that the defendant will commit another offense, N.J.S.A. 2C:44-1(a)(3), and nine, the need for deterring the defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(9). In support of its decision, the court noted defendant's criminal record including "five disorderly persons convictions and "two domestic violence matters." The court also explained that aggravating factor three was applicable because defendant "committed another offense after [the present] offense . . . [and that conduct] is indicative of risk that [defendant] will commit another offense."

The court also concluded no mitigating factors applied. Specifically, the court rejected defendant's request to apply mitigating factor two, whether defendant contemplated that his conduct would cause or threaten serious harm, N.J.S.A. 2C:44-1(b)(2), nine, the character and attitude of the defendant indicate that he is unlikely to commit another offense, N.J.S.A. 2C:44-1(b)(9), and eleven, excessive hardship, N.J.S.A. 2C:44-1(b)(11). The court found mitigating factor two inapplicable because there was no "evidence or any grounds that would tend to justify what [defendant] did on that day." The court also stated that a "reasonable person would [understand] . . . when they pull out a knife and they attempt to use it on a person, there could be serious . . . consequences."

With respect to mitigating factor nine, the court again noted that after the present offense, defendant "committed another offense" and was unable to demonstrate that he had "the character and attitude that [he] wouldn't commit another offense." Finally, the court acknowledged that defendant's imprisonment would cause a hardship on his child and family but found that it was not excessive. In this regard, the court explained that defendant's child "has a loving mother and grandmother who are able to take care of her while [defendant is] incarcerated."

The court merged count seven with count one and imposed concurrent sentences of ten years for the robbery charge and one year for unlawful possession of a weapon charge with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2.

## II.

In defendant's first point, he claims that the court misapplied the Henderson framework and improperly admitted "the unreliable eyewitness testimony at trial" because the court's factual findings were not supported by the record. Specifically, he asserts that the record indicates that Cantine was not provided with instructions informing him that the "suspect may not be the perpetrator and that he . . . should not feel compelled to make an identification."

Defendant also maintains that the court did not properly consider that Cantine was stressed during the showup and viewed defendant from a car approximately forty feet away while defendant was in handcuffs and standing alongside police. Finally, defendant argues that police provided Cantine with impermissible feedback before the showup, when they told Cantine that they "may have the right suspect." We disagree with all of these arguments.

"The Due Process Clause of the Fourteenth Amendment prohibits the admission of an unreliable out-of-court identification, which resulted from

impermissibly suggestive procedures." State v. Smith, 436 N.J. Super. 556, 564 (App. Div. 2014) (citing Manson v. Brathwaite, 432 U.S. 98, 106 (1977)). Eyewitness evidence is inherently suspect, but it is equally recognized that an eyewitness's identification may be the most crucial evidence. Ibid. (quoting State v. Madison, 109 N.J. 223, 232 (1988)).

To challenge an out-of-court identification, "defendant has the initial burden of showing some evidence of suggestiveness that could lead to a mistaken identification," which "in general, must be tied to a system—and not an estimator—variable." Henderson, 208 N.J. at 288-89. Once a hearing has been granted, the State must present proof that the identification is reliable. Id. at 289. The State's burden to offer proof is the same as the burden of producing evidence described in N.J.R.E. 101(b)(2), which is sometimes referred to as the burden of going forward. State v. Henderson, 433 N.J. Super. 94, 107 (App. Div. 2013). "The burden of producing evidence has been described . . . 'as so light as to be little more than a formality.'" Ibid. (quoting State v. Segars, 172 N.J. 481, 494 (2002)). It remains defendant's ultimate burden, however, "to prove a very substantial likelihood of irreparable misidentification." Henderson, 208 N.J. at 289.

"[I]f after weighing the evidence presented a court finds from the totality of the circumstances that defendant has demonstrated a very substantial likelihood of irreparable misidentification, the court should suppress the identification evidence." Ibid. "The threshold for suppression [is] high." Id. at 303.

Although showup procedures are suggestive, they are permissible when accompanied by an "indicia of reliability," such as when they occur close in time and place to the event. See Smith, 436 N.J. Super. at 567; Henderson, 208 N.J. at 259 ("'[T]he risk of misidentification is not heightened if a showup is conducted immediately after the witnessed event, ideally within two hours' because 'the benefits of a fresh memory seem to balance the risks of undue suggestion.'"). However, because a victim may only be presented with one suspect who is in police custody, there is a danger that showup procedures are too suggestive. Smith, 436 N.J. at 567.

Guided by these principles, we discern no basis for disturbing the court's determination that Cantine's showup identification of defendant was sufficiently reliable to be admitted under Henderson. We have considered and reject defendant's contention that Officer Gearren failed to provide proper pre-identification instructions to Cantine. Officer Gearren expressly testified at the

Wade hearing that when he and Cantine arrived at the showup, he explained to him "if [he] could make an identification, go ahead. If it[']s not the subject from your incident, you know, advise us." Further, Officer Gearren noted in the showup identification procedures worksheet dated February 5, 2016, that he instructed the "witness that the actual perpetrator may or may not be in procedure or showup and that the witness should not feel compelled to make an identification." Although defendant challenges the veracity of the worksheet because Officer Gearren did not provide the exact time the document was completed, it was dated, and nothing suggests that the information contained in it is false.

Defendant argues that Cantine failed to provide an accurate timeline as to when Office Gearren provided him with the pre-identification instructions because when asked if Officer Gearren provided him "any further instructions" when he arrived at the showup, Cantine responded in the negative. This testimony, however, does not indicate that Cantine was never given pre-identification instructions. Instead, it suggests that Cantine believed he was provided with instructions prior to his arrival at the showup. In sum, we are satisfied that there is sufficient credible evidence in the record to support the

finding that Officer Gearren provided Cantine with pre-identification instructions. State v. Wright, 444 N.J. Super. 347, 356-57 (App. Div. 2016).

We also reject defendant's argument that the court either did not afford proper weight to the facts that Cantine was still stressed from the altercation and viewed the defendant from a car approximately forty feet away while defendant was in handcuffs and alongside police. Although there is no dispute that Cantine was involved in a stressful situation and testified that he was "shocked" that the incident "actually happened," he did positively identify defendant shortly after the armed robbery, and from an unobstructed and sufficiently illuminated location while in the police vehicle.

In addition, and contrary to defendant's suggestion, "the mere fact that a suspect is presented in or around a police car in handcuffs does not in itself make a showup impermissibly suggestive." Bayer v. Twp. of Union, 414 N.J. Super. 238, 268 (App. Div. 2010); see also State v. Herrera, 187 N.J. 493, 505 (2006) (a "witnesses' identification of the defendant seated and handcuffed in the back of the police car was suggestive but that 'such suggestive circumstances did not render the identification procedure per se improper and unconstitutional.'") (quoting State v. Wilson, 362 N.J. Super. 319, 327 (App. Div. 2003)).

We also reject defendant's argument that the police provided Cantine with improper feedback before the showup identification premised on Cantine's testimony that Officer Gearren told him "they might have the right suspect." In addition to the aforementioned statement, Officer Gearren explicitly told Cantine that "if you could make an identification, go ahead. If it's not the subject from your incident, you know, advise us." That instruction undermines any claim that Officer Gearren provided Cantine with impermissibly suggestive feedback prior to the showup, and we are satisfied, based on the totality of the record, that there was not a "substantial likelihood of irreparable misidentification." Henderson, 208 N.J. at 289.

In any event, several of the Henderson factors strongly weigh in favor of the State and the reliability of Cantine's identification. For example, Cantine was not focused on a weapon while defendant was using his phone, he was not intoxicated, and there was no risk of memory impairment as the entire incident, from the robbery to the identification, occurred in less than two hours. In sum, we are convinced that the court appropriately weighed and applied the Henderson variables.

A-2524-18

III.

We also reject defendant's argument that the court committed plain error by failing to properly instruct the jury "with respect to the "[o]fficer's failure to record the identification procedure" in accordance with Rule 3:11(d).

When a party fails to object to a jury instruction, we employ a plain error standard of review, which "requires demonstration of 'legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to . . . convince the court that . . . the error possessed a clear capacity to bring about an unjust result.'" State v. Chapland, 187 N.J. 275, 289 (2006) (quoting State v. Hock, 54 N.J. 526, 538 (1969)). "The alleged error is viewed in the totality of the entire charge, not in isolation[,]" and "any finding of plain error depends on an evaluation of the overall strength of the State's case." Ibid. (citations omitted). When counsel fails to "object[] at the time a jury instruction is given, 'there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case.'" State v. Montalvo, 229 N.J. 300, 320 (2017) (quoting State v. Singleton, 211 N.J. 157 (2012)).

Rule 3:11(b) provides that "[a] law enforcement officer shall electronically record the out-of-court identification procedure in video or audio format, preferably in an audio-visual format" and "[i]f it is not feasible to make

an electronic recording, a law enforcement officer shall contemporaneously record the identification procedure in writing." Under Rule 3:11(d), "[i]f the record that is prepared is lacking in important details as to what occurred at the out-of-court identification procedure, and if it was feasible to obtain and preserve those details, the court may, in its sound discretion and consistent with appropriate case law, declare the identification inadmissible . . . and/or fashion an appropriate jury charge to be used in evaluating the reliability of the identification."

In State v. Anthony, 237 N.J. 213 (2019) our Supreme Court noted that in cases where officers failed to preserve evidence of identification procedures in violation of Rule 3:11:

> [J]urors should be told that officers are required to record identification procedures electronically; if that is not feasible, they are required to prepare a contemporaneous, verbatim written account of the procedure. If the police did not follow that practice, and, for example, did not capture the dialogue between the witness and the officer, or record a statement of confidence in the witness' own words, the jury may take that into account when it evaluates the identification evidence.
>
> [Anthony, 237 N.J. at 242-43.]

Here, the court instructed the jury on the MPD's failure to preserve dash cam footage. Specifically, the court stated that:

[Y]ou heard testimony that the [MPD] failed to preserve the video recordings from the cam recordings . . . . Law enforcement officers are required to preserve such recordings . . . . A defendant is entitled to test whether the officer's trial testimony is inaccurate because of some inconsistency with what was recorded at the scene or written in the officer's report. When the video recordings and report are not preserved, the defendant is deprived of this opportunity to test the accuracy of the trial testimony.

It is for you the [j]ury to decide the credibility of the evidence presented. In evaluating the officer's credibility you may infer that recordings and a report lost or not preserved before trial contained information unfavorable or inconsistent with an officer's trial testimony. In deciding whether to draw this inference, you may consider all the evidence in the case, including any explanation given as to the circumstances under which the recordings and the report were not preserved. In the end however, the weight to be given to the testimony and to the loss or failure to preserve the recordings and report is for you and you alone to decide.

The court also instructed the jury that it was "free to consider any other factors based on the evidence or lack of evidence[] in the case that [it] consider[s] relevant to [its] determination, whether the identifications were reliable." Although the court did not explicitly instruct the jury that the MPD failed to comply with the requirement to preserve the identification video, it did note that the MPD's failure to preserve the dashcam footage could be considered when judging the officer's credibility. Moreover, the court informed the jury

that it could "consider any other factors based on the evidence, or lack of evidence" which includes the MPD's failure to preserve footage and other evidence, to determine the reliability of the identification. In sum, we are satisfied that the jury properly considered both the credibility of the officers' testimony and the reliability of the identification procedure. While the jury charge was not as robust as defendant claims is required under Rule 3:11(d), it was not clearly capable of producing an unjust result. Chapland, 187 N.J. at 289.

IV.

Defendant next asserts that "the length of the jury deliberations . . . the questions asked during deliberation . . . and the acquittals of most of the offenses" indicates that the admission of the showup identification and subsequent failure to provide the Rule 3:11 jury instruction caused defendant to suffer irreparable harm. We disagree.

As discussed, we are satisfied that the court properly introduced evidence of Cantine's showup identification, and the court sufficiently instructed the jury regarding law enforcement's failure to preserve the dash cam videos and other evidence related to the showup identification. Second, defendant's argument that the jury did not find Cantine and the officers' testimony to be credible is

27

speculative and undermined by the fact that the jury convicted defendant of armed robbery, unlawful possession of a weapon, and possession of a weapon for an unlawful purpose. It is evident from these convictions that the jury accepted Cantine's trial testimony, that is, defendant was in possession of a weapon, which he used in a robbery.

V.

In his next point, defendant contends that the admission of the 911 calls violated his constitutionally protected confrontation rights. Specifically, he maintains that the 911 calls were testimonial statements because neither call sought "assistance with an on-going emergency" and there was no immediate danger to either the callers or Cantine. We are not persuaded by these arguments.

Under both our federal and state constitutions, "[a] criminal defendant has the right 'to be confronted with the witnesses against him' and 'to have compulsory process for obtaining witnesses in his favor.'" State v. Garron, 177 N.J. 147, 168-69 (2003) (quoting U.S. Const. amend. VI; N.J. Const. art. I, 10). "[T]he Confrontation Clause of the United States Constitution bars the 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior

28

opportunity for cross-examination.'" State v. Slaughter, 219 N.J. 104, 116-17 (2014) (quoting Crawford v. Washington, 541 U.S. 36, 53-54 (2004)).

> An out-of-court testimonial statement is the equivalent of "bear[ing] testimony" against an accused. Crawford, . . . 541 U.S. at 51 (citation and internal quotation marks omitted). The Court made clear that the ultimate goal of the Confrontation Clause is to test the reliability of testimonial evidence in "the crucible of cross-examination." Id. at 61; see also [State ex. rel.] J.A., . . . 195 N.J. [324,] 342-43 [(2008)]. The Court reasoned that the Clause "reflects a judgment, not only about the desirability of reliable evidence . . ., but about how reliability can best be determined." Crawford, . . . 541 U.S. at 61.
>
> [State v. Basil, 202 N.J. 570, 591 (2010) (first alteration in original).]

The crucial issue is whether the statement sought to be admitted is "testimonial," as "[o]nly statements of this sort cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." Davis v. Washington, 547 U.S. 813, 821 (2006). Non-testimonial statements are "exempted . . . from Confrontation Clause scrutiny," Crawford, 541 U.S. at 68, but remain limited by the rules of evidence, particularity "traditional limitations upon hearsay evidence." Davis, 547 U.S. at 821.

When examining whether a statement is testimonial, New Jersey's "confrontation jurisprudence has followed the federal approach." State v. Roach, 219 N.J. 58, 74 (2014).

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
>
> [Davis, 547 U.S. at 822.]

More specifically, "interrogations by law enforcement officers fall squarely within [the] class" of testimonial evidence, Crawford, 541 U.S. at 53, however, the United States Supreme Court has concluded 911 calls, although statements to police or their agents, are generally "not designed primarily to 'establis[h] or prov[e]' some past fact, but intended to describe current circumstances requiring police assistance." Davis, 547 U.S. at 827 (alterations in original) (quoting Crawford, 541 U.S. at 53). The Court in Davis concluded the 911 call was not testimonial, and the information was not presented to evade confrontation. Id. at 829.

Our Supreme Court addressed the difference between a testimonial statement made in person to police with a statement made to a 911 dispatcher in State ex rel. J.A., 195 N.J. 324 (2008). In J.A., an eyewitness to a robbery followed the perpetrators. Id. at 330. While in pursuit of the robbers, the eyewitness telephoned the police and provided a description of the suspects, which was then broadcast over the police radio. Ibid. Within two minutes of receiving that dispatch, an officer found the witness and interviewed him about what he saw. Ibid.

The Court found the witness's report to the officer "ran afoul of the Confrontation Clause" as a testimonial statement because "[t]here was no ongoing emergency—no immediate danger—implicating either the witness or the victim, both of whom were in the company of police officers" when the eyewitness made the statements the State sought to admit. Id. at 341, 348. The Court contrasted the witness's statements to the dispatcher "relating . . . events as they were unfolding." Id. at 337. Addressing whether such statements would be considered testimonial, the Court stated that "[h]ad the prosecution introduced the contemporaneous statements of the eyewitness to the 911 operator, assuming that he was relating the robbery in progress and pursuit, the Confrontation Clause analysis might well have been different." Id. at 348 n.13.

Here, the 911 calls are nontestimonial because they reported events as they actually happened. The facts in the calls were necessary to "resolve the present emergency." Davis, 547 U.S. at 827. Defendant's argument incorrectly attempts to bifurcate the February 5, 2016 incident by claiming that because the calls occurred after the robbery occurred, they were past events. Defendant omits, however, that the calls were made while defendant, a then-suspected armed robber, was still at large.

Defendant further asserts that even if the 911 calls were not testimonial, references made by the 911 callers to Cantine being stabbed were hearsay within no applicable exception. Specifically, defendant maintains that the calls were hearsay because: "(1) the callers did not testify at trial and (2) the statements [were] offered for the truth asserted, i.e., that [defendant] did in fact wield a knife against Cantine during the robbery." In addition, defendant argues that the present-sense impression exception, as relied upon by the court, is inapplicable. Although we agree it was error to admit the entirety of the 911 calls under the present sense impression exception to the hearsay rule, we are satisfied that the calls were properly admitted as non-hearsay and not unduly prejudicial.

We afford deference to a trial court's evidentiary rulings, which we uphold "absent a showing of an abuse of discretion." State v. Perry, 225 N.J. 222, 233 (2016) (citations omitted). Erroneous evidentiary rulings will amount to harmless error and preclude reversal where "overwhelming proof" established guilt independent of improperly admitted evidence. See State v. Gillispie, 208 N.J. 59, 93 (2011).

"Hearsay means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." N.J.R.E. 801(c). Hearsay is not admissible unless subject to a specific exception. N.J.R.E. 802. When evidence is admitted for one purpose but would be inadmissible for another, the court must, upon request, issue a limiting instruction. N.J.R.E. 105.

Here, the court correctly determined that the calls were not entered for the truth of the matter. First, the State explicitly noted that it was not offering the 911 calls "for the fact that . . . Cantine was stabbed" but for "the fact that two 911 calls were made." Introduction of the calls for that limited purpose was relevant as it had a tendency within reason to show why and how the police action was initiated, and while it would have been the better course to issue a

limiting instruction even absent a specific request, we are satisfied that the court did not abuse its discretion by admitting the 911 calls.

To the extent the court based its decision to admit the entirety of the 911 calls on the present sense impression exception, that determination was erroneous. Rule 803(c)(1) states that when "[a] statement describing or explaining an event or condition [is] made while or immediately after the declarant perceived it and without the opportunity to deliberate or fabricate," the statement is excluded from the hearsay rule.

Clearly, neither the motorist nor the hair salon employee observed Cantine get stabbed, or defendant attempt to stab him, and could not have made those out of court statements based on any reaction to that event. Their observations of Cantine in his excited state might have been admissible under the exception, but Rule 803(c)(1) would not permit the introduction of Cantine's purported statements that he had been stabbed for their truthful purpose.

In any event, we are satisfied that, even if erroneous, introduction of the 911 calls were harmless as there was overwhelming proof of defendant's guilt. See Gillispie, 208 N.J. at 93. First, we note that at trial Cantine explicitly testified that defendant tried to stab him but conceded that the knife did not pierce his jacket or his skin and that he was not injured at all. Second, Cantine

34

provided a specific and detailed description of defendant, which positively identified him, confirmed that the phone recovered from defendant was his, and identified the knife recovered from defendant as the one used in the robbery.

## VI.

In defendant's final point, he challenges the court's ten-year aggregate sentence on numerous grounds. He primarily argues that the court improperly relied on two dismissed domestic violence complaints, and his arrest for second-degree robbery and third-degree possession of a controlled dangerous substance, N.J.S.A. 2C:35-10(a)(1), for which he had yet to be tried,[5] when applying aggravating factors three and nine. He also contends the court erred in refusing to apply mitigating factors two, four, nine, and eleven.

In addition, defendant maintains a remand is necessary for the court to consider a newly enacted mitigating factor addressed to youthful offenders. Finally, he argues that defendant's first-degree offense should have been treated as a second-degree offense for sentencing purposes.

Although we agree that the court improperly relied upon dismissed and unadjudicated charges when evaluating the aggravating and mitigating factors,

---

[5] The record reflects that defendant was subsequently tried and acquitted of the robbery charge. The State dismissed the possession charge.

the record fully supported the court's finding of aggravating factors three and nine, and the absence of any mitigating factors. Most importantly, the court's ten-year sentence was the minimum permitted for a first-degree offense, and there was no basis to reduce further defendant's sentence by downgrading defendant's first-degree conviction to a second-degree offense.

We employ a deferential standard when reviewing a trial court's sentencing decision. State v. Grate, 220 N.J. 317, 337 (2015); State v. Fuentes, 217 N.J. 57, 70 (2014). We must affirm a sentence unless: 1) the trial court failed to follow the sentencing guidelines; 2) the court's findings of aggravating and mitigating factors were not based on competent and credible evidence in the record; or 3) "'the [court's] application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.'" Fuentes, 217 N.J. at 70 (second alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

Here, before considering and weighing the applicable aggravating and mitigating factors, the court reviewed the presentence report which detailed defendant's significant criminal history. Specifically, within approximately three years prior to the February 5, 2016 incident, defendant had five separate convictions for disorderly persons offenses including simple assault, N.J.S.A.

A-2524-18

2C:12-1(a)(3), resisting arrest, N.J.S.A. 2C:29-2(a)(1), and two related to controlled dangerous substances, which the court appropriately considered.

As noted, however, the court also relied on two dismissed domestic violence charges and pending charges, stating that aggravating factor three was applicable because defendant "committed another offense after [the present] offense . . . [and that conduct] is indicative of risk that [defendant] will commit another offense" and "the fact after this offense you committed another offense, you don't indicate that you have the character and attitude that you wouldn't commit another offense."

Based on our review of the sentencing proceeding, we agree with defendant that the court erroneously relied on two dismissed domestic violence charges and his post-indictment arrest for robbery and possession of a controlled dangerous substance. The court compounded that error by characterizing defendant's arrest as him having "committed the offense". See State v. K.S., 220 N.J. 190, 199 (2015) ("[W]hen no such undisputed facts exist or findings are made, prior dismissed charges may not be considered for any purpose."); State v. Tirone, 64 N.J. 222, 229 (1974) ("[A] defendant's arrest record is a factor which may be considered in the determination of an appropriate sentence so long as the sentencing judge does not infer guilt from charges which have not resulted

37

in convictions."); State v. Green, 62 N.J. 547, 571 (1973) (holding the court may consider arrests but "shall not infer guilt as to any underlying charge with respect to which the defendant does not admit his guilt"); State v. Farrell, 61 N.J. 99, 107 (1972) ("[U]napproved allegations of criminal conduct should not be considered by a sentencing judge.").

Notwithstanding the judge's reference to defendant's pending charges, and dismissed domestic violence charges, we are satisfied that other facts in the record, specifically defendant's multiple convictions over a concentrated period of time prior to the current offense, supported the application of aggravating factors three and nine. Independently and significantly, we note that the ten-year sentence imposed was the minimum for a first-degree offense and, therefore, does not "shock the judicial conscience." Roth, 95 N.J. at 364-65; see N.J.S.A. 2C:43-6(a)(1) ("[A] person who has been convicted of a crime may be sentenced to imprisonment, as follows: (1) In the case of a crime of the first degree, for a specific term of years which shall be fixed by the court and shall be between 10 years and 20 years").

We also find no abuse of the court's discretion in not applying mitigating factor two. Specifically, the court stated that "a reasonable person would [realize] that when they pull out a knife and they attempt to use it on a person,

there could be serious . . . consequences."  Here, in convicting defendant of first-degree armed robbery, the jury specifically found that defendant "attempt[ed] to inflict serious bodily injury, or was . . . armed with or used or threatened the immediate use of a deadly weapon."  In acquitting defendant of aggravated assault it concluded he did not "attempt[] to cause or purposefully or knowingly caused serious bodily injury to . . . Cantine."  Defendant argues that the fact that the jury acquitted defendant of aggravated assault and a defendant could, hypothetically, be convicted of armed robbery without attempting to harm the victim demonstrates that the court's failure to apply mitigating factor two was an abuse of discretion.

While the jury expressly rejected that defendant attempted to or knowingly or purposefully caused serious bodily injury, it did find that he was armed with or threatened the immediate use of a deadly weapon.  Contrary to defendant's assertions, defendant's trial testimony was fairly summarized by the court as "pull[ing] out a knife and . . . attempt[ing] to use it on a person."  In any event, committing a robbery while armed with, and potentially threatening a victim with a knife, undoubtably could "cause or threaten serious harm."  We

are, therefore, satisfied that the court properly refused to apply mitigating factor two.[6]

The court similarly did not err in failing to apply mitigating factor four, "there were substantial grounds tending to excuse or justify defendant's conduct," N.J.S.A. 2C:44-1(b)(4). Specifically, defendant asserts that court improperly failed to consider his mental health issues raised by his counsel at sentencing. Although defendant claims that he suffers from post-traumatic stress disorder, he failed to provide any medical support for this diagnosis at trial. Indeed, the record does not contain any expert's opinion or other evidence, except for defendant's statement in the presentence report, supporting any diagnosis that would warrant application of mitigating factor four under the circumstances.

There was likewise no basis to apply mitigating factor eleven based on the fact that defendant's infant daughter would face a hardship because of his incarceration. The court considered that defendant supported his daughter but

---

[6] We also reject defendant's reliance on State v. Melvin, ___ N.J. ___ (2021). As noted, mitigating factor two would be inapplicable here whether the defendant attempted to cause serious bodily harm or armed himself with a deadly weapon during a robbery. The court's refusal to apply mitigating factor two, therefore, does not go "to the heart of the conduct for which the jury returned a not guilty verdict." Melvin, ___ N.J. ___ (slip op. at 42).

A-2524-18

determined the hardship of imprisonment was not excessive in light of the fact that the child's mother and grandmother are available as caretakers. See State v. Kelly, 97 N.J. 178, 219-20 (1984) (rejecting the application of mitigating factor eleven because the defendant's role as the sole caretaker of her child did not constitute excessive hardship).

Finally, we agree with defendant for the reasons previously discussed, that the trial court erred in relying on his pending charges for robbery and possession of a controlled dangerous substance as a basis for denying application of mitigating factor nine. Despite the court's error in this regard, we are satisfied that the court's decision not to apply mitigating factor nine was not an abuse of discretion based on his otherwise relevant criminal history.

## VII.

We also reject defendant's contention that the recent legislative amendment establishing a new mitigating factor should be given retroactive effect. Defendant was twenty-three years old when he committed the offenses under review. After he was sentenced, the Legislature enacted N.J.S.A. 2C:44-1(b)(14) — a new mitigating factor which applies when a defendant is less than twenty-six years old at the time of the crime. The new mitigating factor was explicitly deemed "effective immediately" on October 19, 2020, see L. 202, c.

110, and is to be applied prospectively. State v. Bellamy, 468 N.J. Super. 29, 44 (App. Div. 2021).

Even if we agree with defendant that N.J.S.A. 2C:44-1(b)(14) is ameliorative in nature, see Bellamy, 468 N.J. Super. at 46-47, a remand for resentencing is not warranted under the circumstances. Indeed, in Bellamy, the court noted that the retroactive effect of the new mitigating factor does not automatically apply for "cases in the pipeline in which a youthful defendant was sentenced before October 19, 2020" based on the enactment of this statute alone. Rather, it means where, "for a reason unrelated to the adoption of the statute, a youthful defendant is resentenced, he or she is entitled to argue the new statute applies." Id. at 47-48.

The Bellamy court remanded the matter for the separate reasons of permitting the sentencing court to consider previously undisclosed reports from the Division of Child Protection and Permanency and reconsideration of the aggravating and mitigating factors before a new judge. The defendant in Bellamy had, thus, "yet to incur a penalty" and the court considered the application of the new factor actor "'retroactive' simply because it was not in effect when defendant was sentenced the first time." Id. at 44-46. Rather than limiting mitigation to the original thirteen factors that existed at the time of

defendant's offense, the resentencing allowed the new factor to be considered on remand. No such independent basis for resentencing exists here. Defendant is, therefore, not entitled to reconsideration of his sentence with the new mitigating factor.

VIII.

Finally, defendant argues that a "proper analysis" of the aggravating and mitigating circumstances and the circumstances of the offense warrant a resentencing as a second-degree offense. N.J.S.A. 2C:44-1(f)(2). We are not persuaded.

As noted, the judge imposed the minimum ten-year NERA term for first-degree robbery. Therefore, the only mechanism to impose a shorter term of imprisonment would be to downgrade the offense one degree lower for sentencing purposes pursuant to N.J.S.A. 2C:44-1(f)(2).

When imposing a sentence for a first or second-degree crime, N.J.S.A. 2C:44-1(f)(2) permits the judge to sentence a defendant "to a term appropriate to a crime of one degree lower than that of the crime for which the defendant was convicted," if "the court is clearly convinced that the mitigating factors substantially outweigh the aggravating factors and where the interest of justice demands."

In deciding whether a downgrade is appropriate, the focus must be on the crime because the downgrade statute "is an offense-oriented provision." State v. Lake, 408 N.J. Super. 313, 328 (App. Div. 2009). A trial court should not downgrade if the "surrounding circumstances of an offense" do not "make it very similar to a lower degree offense." State v. Megargel, 143 N.J. 484, 500 (1996) (explaining that a downgrade from first- to second-degree robbery may be justified where the defendant did not have a weapon but "simulate[d] having a gun by placing his hand in his pocket").

On the record before the court, a downgrade under N.J.S.A. 2C:44-1(f)(2) was not warranted as defendant did not meet the high standard required for such relief. Megargel, 143 N.J. at 500. Defendant was convicted of an armed robbery on a seventeen-year-old and, at the time of the February 5, 2016 offense, had five prior disorderly persons convictions. Under such circumstances, the interest of justice simply does not compel a downgrade. N.J.S.A. 2C:44-1(f)(2); see also Megargel, 143 N.J. at 501-02, 504-05.

To the extent we have not addressed any of defendant's remaining arguments, it is because we have concluded they are of insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2524-18